**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 17-4214**

─────────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

JONATHAN LEIGH WIENKE,

        Defendant - Appellant.

─────────────

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg. Gina M. Groh, Chief District Judge. (3:16-cr-00026-GMG-RWT-1)

─────────────

Argued:  February 28, 2018                     Decided:  May 2, 2018

─────────────

Before DUNCAN, AGEE, and WYNN, Circuit Judges.

─────────────

Affirmed by unpublished per curiam opinion.

─────────────

**ARGUED:** Nicholas Joseph Compton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant. Anna Zartler Krasinski, OFFICE OF THE UNITED STATES ATTORNEY, Martinsburg, West Virginia, for Appellee. **ON BRIEF:** Kristen M. Leddy, Research and Writing Specialist, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Martinsburg, West Virginia, for Appellant. Betsy Steinfeld Jividen, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

─────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jonathan Wienke pleaded guilty to making a firearm in violation of the National Firearms Act, I.R.C. §§ 5801–5872, upon the condition that he could appeal the district court's denial of his motion to suppress all evidence seized from his residence pursuant to four search warrants. Because the affidavit accompanying the first warrant application supported a finding of probable cause to search his residence, we affirm the district court's denial of Wienke's motion and affirm his conviction.

I.

In June 2016, Wienke worked for the Department of Homeland Security ("DHS") as a Management and Program Analyst in the Office of Intelligence and Analysis at DHS's Nebraska Avenue Complex ("the NAC") in Washington, D.C. Wienke had no law enforcement powers or duties in his DHS employment or otherwise.

At the time relevant to this case, Wienke resided in Martinsburg, West Virginia. Each workday, he rode the early morning Maryland Area Regional Commuter train from Martinsburg to Washington and then took the Metro to the NAC. Wienke was one of over 3,000 federal employees working at the NAC, which has stringent security requirements akin to those of the Pentagon, the White House, and the Capitol. For example, before employees enter their work buildings, they must leave any items not permitted in their secure workspaces in storage lockers outside.

On the morning of June 9, Wienke was selected for random security screening as he entered the NAC. Security officers searched Wienke's backpack and found a folding

knife with a three-inch blade, two handheld radios, pepper spray, an infrared camera, a pair of handcuffs, a breathalyzer, and a cell phone adapter with earbuds. They also discovered a handcuff key on his person. After seizing the knife and pepper spray, the security officers let Wienke proceed to his workplace within the NAC.

Later that morning, Special Agent Eric Mann, the Chief Security Officer of DHS's Internal Security and Investigations Division, and another security officer approached Wienke at his cubicle, which was adjacent to a room for a meeting of senior DHS officials scheduled for that day. With Wienke's consent, Mann searched the cubicle and then asked if Wienke was armed. When Wienke replied that he was not, Mann obtained consent for a pat-down and found a second handcuff key as well as a five-shot .22 caliber revolver loaded with hollow-point bullets in Wienke's pocket. Wienke audibly swore when Mann discovered the gun.

Soon afterward, Mann applied for a warrant to search Wienke's home in Martinsburg for evidence of various crimes, including the attempted killing or kidnapping of a member of the executive branch, in violation of 18 U.S.C. § 351; the attempted killing of a government employee engaged in official duties, in violation of 18 U.S.C. § 1114; conspiracy against the United States, in violation of 18 U.S.C. § 371; impersonation of a federal officer, in violation of 18 U.S.C. § 912; and possession of a firearm in a federal facility, in violation of 18 U.S.C. § 930. In an affidavit supporting the warrant application, Mann stated that based on his training and nine years of experience

as a DHS law enforcement officer,[1] people bringing concealed firearms onto federal property pose a significant threat to federal officials and employees. According to Mann, the combination of the two radios with the other items found in Wienke's possession established probable cause that he was involved in a conspiracy to commit workplace violence. Mann further averred, based on his training and experience, that people conspiring to commit violence against senior federal officials generally keep evidence related to such a conspiracy in their homes. The warrant application provided a description of Wienke's Martinsburg house and a list of items to be seized, including any weapons, firearms, computers, photographs of co-conspirators, and documents related to the alleged acts.

A magistrate judge issued the warrant on the evening of June 9. Less than an hour later, Mann and other officers executed the warrant, seizing a number of electronic storage devices and firearms from Wienke's home. One of those firearms, a Walther P22, had an attachment that appeared to be a silencer bearing no serial number or other identifying mark. A Bureau of Alcohol, Tobacco, and Firearms agent participating in the search suspected that the silencer may have been illegally constructed. The officers also seized what appeared to be components for constructing another silencer.

On June 13, Special Agent Patrick Kelley, another DHS officer, applied for and obtained three additional warrants to search two sheds and a vehicle on Wienke's

---

[1] Mann also had ten years of experience as a Special Agent with the Naval Criminal Investigative Service, giving him almost two decades' involvement in conducting investigations and applying for search warrants.

Martinsburg property. In addition to seeking evidence of the crimes already under investigation, these warrants also sought evidence of firearm[2] construction, which is unlawful unless a special tax has been paid under I.R.C. § 5861. Officers executed these three warrants later that day, but discovered no further evidence relevant to the initial charges. Ultimately, as the Government concedes, no evidence seized pursuant to the four search warrants indicated that Wienke was actually plotting to kill or kidnap any high-ranking government official.[3]

A grand jury in the Northern District of West Virginia indicted Wienke on seven counts of violating the National Firearms Act. Before the district court, Wienke moved to suppress all physical evidence in the case, arguing that the first warrant (executed on June 9) was not supported by probable cause and lacked a nexus between the crimes for which he was under investigation and his residence. The three additional warrants, he argued, were invalid because "they were based upon evidence and information gleaned from the first defective search warrant and are thus the 'fruit of the poisonous tree.'"[4] Opening Br. 8. Wienke further argued that the *Leon* good-faith exception should not apply to any of the warrants. *See generally United States v. Leon*, 468 U.S. 897 (1984). The Government responded that Mann's affidavit set forth sufficient facts supporting probable cause and

---

[2] The relevant statutory definition includes silencers in the definition of "firearm." I.R.C. § 5845(a).

[3] In explanation for the items discovered at the NAC, Wienke asserts that he is a "prepper" and that he carried the items in case of an emergency while riding the Metro to work. He has a West Virginia concealed carry permit and no prior criminal history.

[4] We note that the "fruit of the poisonous tree" doctrine requires the suppression of evidence discovered pursuant to an illegal search. *See Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). The "fruit" that would need to be suppressed, therefore, is not the three warrants, but any evidence seized pursuant to them.

that his training and experience, coupled with the inherent reasonableness that the items sought would be found at Wienke's home, established a sufficient nexus between his residence and the items the warrants sought. In the alternative, the Government argued that the *Leon* good-faith exception applied to each warrant.

After a hearing, the district court denied Wienke's motion to suppress and found that probable cause supported all four warrants.[5] The court found Mann to be a reliable affiant and that his affidavit in support of the first warrant properly set forth the place to be searched, the items to be seized, and the evidence substantiating the allegations of criminal conduct under investigation. Further, it observed that the affidavit listed the items in Wienke's possession when he entered the NAC and noted that he possessed a concealed and loaded firearm near where senior DHS officials were to meet. The court concluded that, taken together, this evidence established both probable cause and the requisite nexus between the place to be searched and the items to be seized. The court applied this ruling to all four search warrants.

Wienke conditionally pleaded guilty to making a firearm in violation of the National Firearms Act, I.R.C. §§ 5822, 5861(f), 5871, and 18 U.S.C. § 921(a)(24), and reserved the right to appeal the district court's denial of his motion to suppress. The Government dismissed the remaining charges. The district court accepted the plea and sentenced Wienke to eighteen months of imprisonment, followed by two years of supervised release. Consistent with the terms of his conditional guilty plea, Wienke

---

[5] The court also denied Wienke's motion for a *Franks* hearing. *See Franks v. Delaware*, 438 U.S. 154 (1978). Wienke did not appeal that ruling.

appeals the denial of his motion to suppress.  We have jurisdiction over this appeal under 28 U.S.C. § 1291.

## II.

On appeal, Wienke argues, as he did below, that the first search warrant was not supported by probable cause because the warrant application was insufficient and failed to establish a sufficient nexus between the alleged criminal conduct and his residence. He further argues that the *Leon* good-faith exception would not salvage the Government's case if the warrant lacked probable cause. The Government responds that the first warrant was supported by both probable cause and a sufficient nexus between the items to be seized and Wienke's residence, but, in the alternative, the *Leon* good-faith exception applies.

"We review a district court's factual findings in deciding a motion to suppress for clear error, and the court's legal conclusions de novo." *United States v. Gardner*, 823 F.3d 793, 799 (4th Cir. 2016). In undertaking this review, we "give due weight to inferences drawn from [the] facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996). We view the facts in favor of the Government, the prevailing party below. *See Gardner*, 823 F.3d at 799.

Because we agree with the district court that Mann's affidavit supplied probable cause by establishing that the evidence sought by the warrants was properly subject to seizure and that there was a sufficient nexus between evidence of Wienke's alleged criminal conduct and his residence, we need not address the *Leon* good-faith exception.

In addition, because Wienke agrees that the validity of the latter three warrants depends on the validity of the first, our holding as to the first warrant completes our inquiry.

A.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This constitutional protection is realized through the requirement that a "neutral and detached magistrate" find probable cause to support a warrant. *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (internal quotation marks omitted).

The evaluation of whether a search warrant is supported by probable cause turns first on whether the items to be seized are evidence of criminal activity, *see Zurcher v. Stanford Daily*, 436 U.S. 547, 556 & n.6 (1978), and second, on "whether it is reasonable to believe that the items to be seized will be found in the place to be searched," *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993). *See United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2017). This analysis utilizes a totality-of-the-circumstances approach grounded in the commonsense recognition that "affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation" and officers in the field rely upon their training and experience to draw reasonable inferences from the evidence. *Gates*, 462 U.S. at 235 (internal quotation marks omitted); *United States v. Johnson*, 599 F.3d 339, 346 (4th Cir. 2010) (noting an officer can draw on his experience to make inferences and determine whether probable cause exists). A magistrate must consequently "make a practical, common-sense decision whether, given all the circumstances set forth

9

in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

To satisfy the second prong of the probable cause inquiry, an affiant must show a sufficient "nexus between the place to be searched and the items to be seized." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). Whether such a nexus exists turns on "the nature of the item and the *normal inferences* of where one would likely keep such evidence." *Id.* (emphasis added). Again, officers may draw conclusions from their experience, judgment, and observations when identifying the place to be searched. *See United States v. Lyons*, 740 F.3d 702, 723–24 (1st Cir. 2014) (holding that an officer's training-and-experience statement, coupled with other observations, sufficiently established a nexus between money and illegal betting records and the defendant's residence); *United States v. Vanderweele*, 545 F. App'x. 465, 469 (6th Cir. 2013) (holding that an officer's training-and-experience statement that firearms and "'related items are commonly stored'" in the owner's residence established a sufficient nexus). The magistrate may draw a reasonable inference from the facts stated if the affiant does not assert facts "directly linking the items sought to the defendant's residence." *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005) (internal quotation marks omitted).

The "normal inferences test" of the nexus analysis starts with the general rule that "it is reasonable . . . to assume that a person keeps his possessions where he resides." *Peffer v. Stephens*, 880 F.3d 256, 270 (6th Cir. 2018). The applicability of this assumption depends on the nature of the evidence to be seized and the offense under investigation. *See id.* at 271–72; *United States v. Singleton*, 125 F.3d 1097, 1102 (7th Cir.

1997). For example, "the use of a gun in the commission of a crime is sufficient to establish a nexus between the suspected criminal's gun and his residence" because guns are generally kept in the home. *Peffer*, 880 F.3d at 272; *Anderson*, 851 F.2d at 729 (finding that it is reasonable "to believe that the defendant's gun and the silencer would be found in his residence"). Similarly, if photographs are part of the alleged crime, the nature of photographs leads to the reasonable inference that they would be kept in the defendant's residence. *United States v. Doyle*, 650 F.3d 460, 472 (4th Cir. 2011) (holding the lower court properly concluded that "if [the defendant] actually possessed child pornography, it was reasonable to assume that [he] kept it at his house"). On the other hand, in the investigation of a drug distribution offense, it is often unreasonable to suspect that drugs will be at the defendant's residence because "when drugs are used in the commission of a distribution offense, the distributed drugs are no longer in the possession of the suspected distributor." *Peffer*, 880 F.3d at 273. These common-sense considerations further demonstrate that whether probable cause supports a warrant is a highly fact-specific inquiry.

B.

With this foundation in mind, we first address Wienke's argument that the first warrant lacked probable cause because the warrant application did not include specific evidence of Wienke's alleged criminal activity. He notes the absence of several types of evidence that could be used to establish probable cause, such as informant testimony or an anonymous tip. Wienke further argues that Mann's affidavit contained insufficient evidence to support the assertions that Wienke was impersonating a law enforcement

11

officer and that he knew the high-level DHS officials would be meeting near his cubicle. For these reasons, he asserts, the warrant was defective and the resulting search was invalid.

Wienke's argument lacks merit. To the extent that we look to the evidence of criminal conduct when reviewing the validity of a search warrant, we do so to determine whether "the items sought are in fact seizable by virtue of being connected with criminal activity." *Zurcher*, 436 U.S. at 556 n.6. The warrant application contained ample evidence indicating a fair probability that the items the search warrant sought to seize were evidence of criminal activity. Mann's affidavit described his firsthand observations and those of other DHS security officers on June 9 when they saw Wienke 1) with a knapsack filled with numerous suspicious items, including two radio communication devices, pepper spray, and a knife; 2) attempt to enter a highly secure DHS facility with those items; 3) carry a concealed firearm loaded with hollow point bullets into that secure facility; and 4) carry the concealed firearm in close proximity to a meeting place of high-level DHS officials. Such firsthand observations and personal knowledge may be used in establishing probable cause. *See, e.g.*, *United States v. Wylie*, 705 F.2d 1388, 1392 (4th Cir. 1983). Further, Mann's training and experience informed his reasonable inference from these facts that there was a likelihood that Wienke was conspiring to harm the DHS officials or otherwise commit workplace violence.[6] Even without relying on Mann's

---

[6] Wienke primarily argues that the evidence did not adequately establish that he impersonated a law enforcement officer or that Mann actually knew that Wienke was aware of the meeting of DHS officials. Even if we disregarded these portions of Mann's affidavit, *see* (Continued)

training and experience, a reasonable person could infer that someone who enters a highly secure government building without authority to possess therein a knife, radios, pepper spray, an infrared camera, handcuffs, and a concealed, loaded firearm adjacent to a high level DHS meeting may be plotting unlawful actions. Indeed, it would be unreasonable *not* to make that inference.

The warrant application sought "evidence regarding planning, preparation, and information on the identity of conspirators" from Wienke's home. J.A. 49. The warrant described in detail the evidence to be seized, which included items similar to those noted above as well as documents that would be used in planning an attack in a facility, including maps, blueprints, schedules, and notes; and evidence that could identify possible co-conspirators, including photographs and address books. It was reasonable to conclude these items could be evidence of the criminal activity alleged against Wienke.

Therefore, Mann's affidavit sufficiently established that the search warrant properly sought seizable evidence of probable criminal activity.

C.

Wienke also argues the search warrant lacked probable cause to search his home because it failed to establish a sufficient nexus between his alleged criminal conduct at the NAC and his West Virginia residence. We disagree. Whether probable cause supports a search warrant depends on "whether it is reasonable to believe that the *items to be*

---

*Wylie*, 705 F.2d at 1390 (considering only the uncontested portions of the affidavit), Mann still cited ample evidence of a possible conspiracy to commit workplace violence sufficient to establish probable cause for the first search warrant.

13

*seized* will be found in the *place to be searched.*" *Lalor*, 996 F.2d at 1582 (emphases added). Thus, our analysis focuses on whether the warrant application established a sufficient nexus between the *items* Mann listed in the warrant application and Wienke's residence. *See Anderson*, 851 F.2d at 729.

Among other types of evidence, Mann's warrant application identified weapons, firearms, documents, photographs, and address books that could identify co-conspirators as well as evidence that may be related to the crimes alleged. It is reasonable to infer that these types of possessions would be kept in Wienke's residence; this Court has already held as much. *See id.* (holding it was reasonable to believe a gun and silencer would be kept in a residence); *Doyle*, 650 F.3d at 460 (holding it was reasonable to believe that photographs of child pornography would be kept in a residence). Further, these items are not ordinarily expended when used in the commission of the type of crimes alleged here. *See Peffer*, 880 F.3d at 273 (differentiating guns and computers, which are typically found at home, from drugs in a distribution offense). This rationale distinguishes Wienke's case from the drug seizure cases he relies upon in his brief. Because it is reasonable to infer that weapons, photographs, and other documents would be found in a person's home, the allegations in the warrant application provided a sufficient nexus between the items to be seized and Wienke's residence.

The distance between Wienke's residence and the NAC is of no consequence under the facts of this case. The cases in Wienke's brief that include geography in the nexus analysis are distinguishable for several reasons. In some of the cases, the items to be seized were not the type one would normally expect to find at the home. *E.g.*, *United*

14

*States v. Gramlich*, 551 F.2d 1359, 1361–62 (5th Cir. 1977) (holding no probable cause existed to search the residence of a defendant who was caught ferrying marijuana from a Columbian freighter to shore); *United States v. Flanagan*, 423 F.2d 745, 746–47 (5th Cir. 1970) (holding no probable cause existed to search a defendant's residence for the fruits of a home robbery). These cases are not instructive here because, as already noted, the warrant sought the types of evidence which one would reasonably expect to find in a person's residence. In *United States v. Green*, another case Wienke cites, the residence in question was too far removed from where the alleged criminal conduct occurred for the defendant to have concealed evidence of that conduct. 634 F.2d 222, 225–26 (5th Cir. Unit B Aug. 1981) (holding that criminal activity in California did not justify a search of the defendant's Florida home). *Green* stands in stark contrast with Wienke's regular routine of commuting each workday from his Martinsburg residence to the NAC. Because he regularly commuted from West Virginia, his residence was readily available to him for the concealment of evidence of any criminal activity that he could have been planning to perpetrate at the NAC.

Therefore, the warrant application established a sufficient nexus between the evidence to be seized and Wienke's residence.

### III.

The facts alleged in the first warrant application were sufficient for the magistrate to make a finding of probable cause. Inasmuch as Wienke agrees that the validity of the latter three warrants rises and falls on the validity of the first, all four search warrants

15

were properly supported by probable cause. We therefore affirm the district court's denial

of Wienke's motion to suppress and affirm his conviction.

*AFFIRMED*